IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

RUDOLPH NICHOLAS ESCHER, JR.,    )
    )
    Plaintiff,    )
    )
    )
v.    )    No. 3:06-CV-336
    )
BWXT Y-12, L.L.C.,    )
    )
    Defendant.    )

## MEMORANDUM OPINION

This civil action is before the court for consideration of "Defendant's Motion for Summary Judgment" [doc. 35]. Plaintiff Rudy Escher ("Escher") has filed a response [doc. 43], and defendant BWXT Y-12, L.L.C. ("BWXT") has submitted a reply [doc. 51]. Oral argument is not necessary, and the motion is ripe for the court's consideration.

Escher has brought suit for alleged violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301-4333, the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304, and common law retaliation.[1] For the reasons set out herein, the motion will be granted, and this case will be dismissed.

---

[1] Escher alleged in his complaint a claim for age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.* However, in his response to BWXT's motion for summary judgment, Escher conceded that he "does not wish to persist in his claims of age discrimination under the ADEA or the THRA" [doc. 43].

# I.

## *Background* [2]

Escher graduated from the United States Naval Academy in 1978 and was discharged from active duty in 1984 after six and one-half years of service in nuclear submarines. After leaving active duty in 1984, Escher joined the Naval Reserves eventually rising to the rank of Captain. Escher was hired by BWXT's predecessor in 1985, and he transferred to the Oak Ridge, Tennessee facility in 1989. In 1997, Escher transferred to the Metrology Center, which is a calibration laboratory. William McKeethan ("McKeethan") was the Department Manager for the Metrology Center and selected Escher for the Engineering Manager position. McKeethan was aware of Escher's Naval Reserve duties when he selected him for the job. As an Engineering Manager, Escher managed, trained, and hired the engineers and technicians who worked in the Metrology Center.

McKeethan supervised Escher and considered him to be a good performer. Escher received the highest possible performance ratings and better than average raises, and he completed his assignments. Prior to the events that led to this lawsuit, Escher had never received any written discipline, although McKeethan on occasion had taken Escher aside and orally discussed with him a work-related issue concerning his conduct. McKeethan did not believe that Escher's Naval Reserve position interfered with his work at BWXT and supported Escher's participation in the Naval Reserve. Escher in fact twice nominated

---

[2] Plaintiff's contentions regarding the interpretation and application of the facts will be discussed in the analysis portion of the court's opinion.

2

McKeethan for a "Certificate of Appreciation" from the Employer Support for the Guard and Reserve ("ESGR") for "outstanding service to the national defense through continuing support for the National Guard and Reserve." The ESGR is an organization of the Department of Defense that promotes cooperation and understanding between employers and military Reserve components and to help with conflicts that arise because of Reservists' commitments.

BWXT's Military Leave Policy allows salaried employees to receive their full salary in addition to any military pay for up to 80 hours of annual military training. Training time that exceeds 80 hours is taken without pay. The Policy permits exempt salaried employees to receive up to 173.3 additional hours of "make up pay" per year, one month of time, when they are away for "intermittent emergency duty" or "intermittent active duty."

Prior to 2004, in the situation where a Reservist's training exceeded 80 hours and where an exempt employee worked a partial week and took the remainder of the week as "unpaid military leave," BWXT paid the exempt employee's full salary for the entire week. This was done to avoid salary "docking" that could destroy the white collar exemption under the Fair Labor Standards Act. Escher received the benefit of being paid full salary beyond the maximum 80 hours of military leave pay in 2002 and 2003. However, in 2004, BWXT implemented the A-Plus payroll system that does not permit exempt employees to enter a partial week of "unpaid military leave." Pursuant to this policy, employees may choose to charge the balance of the week to unpaid personal leave, paid personal leave, or

3

vacation.

BWXT provided as of February 2005 for National Guard or Reserve employees called to active duty make-up pay and a continuation of medical and dental insurance at active employee rates for 18 months of active duty. BWXT also continued life insurance and special accident insurance, provided a savings plan catch-up upon return from military leave and also provided a point of contact for the spouses of families of employees on military leave. BWXT has represented that these benefits are not required by USERRA.

BWXT has been recognized by the ESGR as an outstanding employer of National Guard and Reserve employees. In 2003 BWXT received an award from ESGR for its employees raising over $10,000 for care packages to servicemen. In 2005, BWXT received recognition by ESGR's "5-Star Employer Program" as an outstanding employer for its willingness to support employees called to military service. In 2005, BWXT employed 115 employees who were members of the National Guard or Reserve.

In September 2004, Escher made a complaint about how his military time was accounted for in the BWXT system. After he had exhausted his 80 hours of paid military leave, Escher worked a partial day and then recorded the remainder of the week as unpaid military leave. The A-Plus system would not permit him to charge his time in this fashion. Escher contacted Linda Smith-Bledsoe ("Smith-Bledsoe"), an employee in the payroll department who reported Escher's tone as "irate." Smith-Bledsoe told Escher that the A-Plus system would not accept less than a full week of unpaid military leave and that he had to

4

charge his time to unpaid personal leave, paid personal leave, or vacation. Smith-Bledsoe confirmed the situation with Dan Cottrell ("Cottrell"), the manager of the Compensation Department. Escher recorded his time as unpaid personal leave.

Escher's concern was that taking unpaid personal leave would reflect negatively on his review. Smith-Bledsoe testified in deposition that unpaid personal time is frowned upon by the management and could affect performance reviews. However, Escher received the highest possible performance rating for 2004, and he acknowledged that how his time was charged had no negative impact on his review.

Escher contacted ESGR regarding this time dispute and wrote to Cottrell and BWXT's legal counsel Ken Brown ("Brown") referencing USERRA. There is no indication that ESGR ever contacted BWXT concerning this matter, and Escher let the matter drop.

In July 2005, Escher was on an operational assignment for the Navy in Naples, Italy and was gone for a total of 22 days. Escher testified that he spoke with McKeethan and probably Smith-Bledsoe about how to charge his time before he left because of the problem he had experienced in 2004. Escher took two weeks of military leave with pay from June 20 to July 1, 2005. He also needed an additional week of military leave for July 4-8. When he returned, Escher entered unpaid military leave for July 6-8, as there were scheduled days off that week for the July 4th holiday. Escher's orders were titled "Active Duty for Training," but he contended the assignment was operational not training.

Smith-Bledsoe informed Escher that he could not enter a partial week of unpaid military leave. Escher maintained that he was entitled to "make-up pay," which Smith-Bledsoe said he could apply for but the absence still had to be recorded as without pay. Escher spoke with Carol Johnson ("C. Johnson"), a senior human resources specialist in compensation, several times about the leave issue. In doing so, he asserted his reliance on USERRA and sent C. Johnson information about USERRA. C. Johnson spoke with Smith-Bledsoe and Brown about the issue. Eventually, C. Johnson told Escher that she needed to be "out of the loop" and she could not talk to him anymore about the issue. C. Johnson does not disagree that Brown may have told her not to speak with Escher about the pay matter any further.

Escher contacted a Knoxville attorney, Maurice Gerard ("Gerard"), an ESGR representative. Gerard attempted to contact Brown by telephone and eventually wrote him a letter concerning Escher's pay issue. The letter is dated September 9, 2005, and referenced a "difference of opinion as to whether an employee's rights under USERRA are being violated." In an e-mail sent September 21, 2005, Brown told Smith-Bledsoe that he "reviewed the e-mails, BWXT policies and other material in connection with the question of how to handle Mr. Escher's Orders (whether they were for training or active duty). . . ." Brown told Smith-Bledsoe that Escher should be paid holiday pay for July 4 and 5 and make-up pay for July 6, 7 and 8.

6

BWXT contracts with the National Nuclear Security Administration ("NNSA") to manage the Y-12 facility in Oak Ridge. The contract provides that "Government property shall be used only for the performance of this Contract." BWXT has specific standards of business conduct that are set out in the *Employee Handbook: Standards of Business Conduct and Business Ethics* ("Standards"). Escher acknowledged that he received and reviewed these Standards on September 25, 2000. The Standards state in pertinent part: "We are determined to enforce our policy of compliance, to investigate any reported violations, and to take disciplinary action, up to and including termination of employment, against employees who violate the policy."

> The Standards specifically address the use of technology systems:
>
> BWXT Y-12 and client-furnished supplies and equipment are not intended for personal use. BWXT Y-12 and client furnished facilities, equipment, and supplies must be used for BWXT Y-12 business and associated purposes specifically authorized by management. This applies to office supplies, and equipment, personal computers, software and associated support items.
>
> . . . .
>
> Internal information systems, communications facilities and system[s] (including e-mail, interoffice mail, and voice mail networks), and databases are to be used for business purposes. Unauthorized use is considered a misappropriation of BWXT Y-12 assets.

The Standards also specifically address the use of e-mail and the Internet:

> As we increasingly use the power of electronic mail and the Internet to perform our work, it is critical that all employees understand that inappropriate use of these tools will not be

7

tolerated.  To be specific:

• Employees may not use company computers to play computer games or to "surf" the net for non-business purposes.

. . .

• BWXT Y-12's network and Internet connection will be used for official use.  However, incidental use is permissible as long as it does not interfere with the operations of BWXT Y-12, create additional costs, or interfere with employee's duties.  These assets must be used with the utmost care and respect, guarding against fraud, waste and abuse.

• Use of BWXT Y-12 e-mail system and Internet connection for personal advertisement or gain; on behalf of outside business ventures; . . . is prohibited.

. . .

Accessing the Internet for non-business reasons during scheduled work hours may be viewed in the same way as being absent from work without permission.  There is no excuse to take unauthorized time away from your assigned tasks to access the Internet for personal use.

BWXT also has in place a procedure entitled Acceptable Use of Information Technology

Equipment, No. Y15-404.  This procedure provides that "IT resources are to be used for the

conduct of official U.S. Government or Y-12 business with the exception of occasional

personal non-business matters requiring attention during work hours."  The procedure further

states that "inappropriate, unauthorized, or improper use of IT resources is prohibited and is

subject to disciplinary action up to and including termination."  "Occasional use of e-mail

for personal matters needing attention during working hours is acceptable" under the

8

procedure.

Escher was required to review every two years General Employee Training ("GET") materials that included information regarding the policies concerning e-mail and internet use and the disciplinary penalties for violating the rules of use. Escher was tested on the GET materials in December 2001, October 2003, and August 2005.

In January 2005, a retired Metrology Lab employee, Ed Prichard, sent a letter to McKeethan complaining about Escher. In it Prichard said that Escher "spent two to four hours a week sometimes on Navy work." McKeethan knew Prichard and Escher hated each other, so he considered the source. However, McKeethan confronted Escher with the allegations made by Prichard and specifically asked if Escher was abusing the computer for his Naval Reserve work. Escher denied the allegations and said that he occasionally forwarded e-mails home.

McKeethan e-mailed Steve Weaver, the manager of Employee Relations, and asked him to check Escher's portal entry records and told him, "[I] was told Rudy spends many hours using the computer for non-company business. We probably need to check that out also." McKeethan inquired about the portal entries because in 2002-2003 there had been a problem with Escher being tardy. Weaver testified that he thought McKeethan was referring to non-work related use of the internet, so he requested Diane Williams ("Williams") of BWXT Cyber Security to make a report on Escher's internet use for the past six months. Williams performed the review, but found no problems with Escher's internet

9

use. The portal entry records that were sent to Weaver and McKeethan also did not show a problem.

On August 17, 2005, BWXT's Ethics Officer Roseann Taylor ("Taylor") was assigned to investigate an anonymous complaint about Escher that had been received through the No More Surprises ("NMS") Program. BWXT began this program in October 2004 to encourage employees to raise concerns about issues and polices, including fraud and abuse of government assets, without fear of retribution. Submissions could be made anonymously by computer. The anonymous complaint regarding Escher states:

> I feel a supervisor in our group (badge #030198) is committing time card fraud and is blatantly abusing time. This supervisor is a full-time employee (high level in pay) and is a member of the Naval Reserves (high level pay). The majority of his time while at Y-12 is being spent performing military work (e-mail, phone, fax, etc.). Shouldn't the military job be considered as second job since he makes a huge salary because he is very high level in the military? If one of his employees was doing work for a second employer, he would discipline them very highly including threat of termination. This supervisor gives the impression he is unstoppable and always right in the things he does. Management seems to be afraid of him. Why is he given preferential treatment? Maybe someone needs to look at his APLUS time to see what he is charging his time to because 90-95% is being spent on military work. Bet his phone records would be interesting as well.

Taylor requested Williams to check Escher's e-mail for the past six months. Williams reviewed Escher's e-mail stored on the Y-12 server and discovered thousands of e-mails related to the Naval Reserve and Navy documents not connected to Y-12. The e-mails were stored and organized in hundreds of files. Williams e-mailed Taylor informing her of the

10

volume of documents and attached many of the Navy documents. Taylor reviewed the e-mails and documents and determined that were was sufficient reason to believe Escher was violating the BWXT computer use policy.

Taylor notified Escher's division manager, Nancy Johnson ("N. Johnson"), on August 24, 2005, about her investigation of the anonymous complaint and what she had found. Taylor asked N. Johnson if she had given Escher permission to handle Naval Reserve matters while he was working at Y-12. N. Johnson said she had not done so. Taylor asked N. Johnson to keep the investigation confidential.

Also on August 24, 2005, Taylor spoke with McKeethan by telephone about the investigation. McKeethan said that he had not given Escher permission to do Naval Reserve work during Y-12 work hours. He said he knew Escher received "an occasional phone call from the reserves as well as occasional emails. But nothing extensive, nothing that takes a whole lot of time." McKeethan told Taylor that the time Escher spent on Reserve business probably went up around 911 and at the start of the Iraq war. McKeethan mentioned to Taylor that there had been some controversy about the way Escher's time was charged for his Reserve obligation in 2005, and Escher had copied McKeethan on the e-mails he sent concerning his leave complaints during July 2005. However, there is no indication McKeethan mentioned USERRA when he spoke with Taylor. As with N. Johnson, Taylor requested that McKeethan keep the investigation confidential.

11

Because the documentation retrieved from Escher's e-mail was related to Naval Reserve matters, Taylor was concerned that it could contain classified material. She therefore turned the discs on which she had transferred the information over to Jim Nobles ("Nobles"), a BWXT internal auditor. Nobles contacted the FBI to review the documents.

Taylor discussed the situation with Weaver on August 30, 2005. Weaver suggested that Taylor close her part of the investigation because discipline on computer abuse cases was handled by Employee Relations. Taylor issued a finding on August 31, 2005, regarding the allegation against Escher. She found that the allegation that Escher was doing personal business, Naval Reserve business, while at work was "with merit."

On August 31, 2005, Taylor informed N. Johnson that her review was completed. Based on the preliminary findings, N. Johnson told McKeethan that she was placing Escher on administrative leave with pay. On September 5, 2005, Labor Day, McKeethan met with Escher at his home and informed him that he was on administrative leave with pay. Escher testified in his deposition that McKeethan told him there was an investigation about his internet usage.

The FBI ultimately determined that none of the material Escher had stored on the Y-12 server was classified information, and the information was returned to Taylor. Taylor turned her file over to Weaver and Steve Long, a Human Resources Specialist. At the request of Weaver, Long led the investigation, which included a review of Taylor's investigation file the e-mails and documents Escher had stored on the Y-12 server. N.

12

Johnson requested that Weaver and Long provide a specific accounting of the e-mail and documents involved.

Long opened, reviewed, and inventories the e-mails which totaled more than 3,200 in more than 240 folders and subfolders. He discovered two separate files outside the e-mail system that contained Navy related documents: 18 PowerPoint presentations, 75 Word documents, 38 Excel spreadsheets, 12 PDF documents, and 140 miscellaneous documents. Escher's e-mail use covered 1999-2005.[3] Long determined that Escher was sending and receiving e-mails during work hours. He also verified that Escher was using the BWXT e-mail address as an automatic signature, which would invite recipients to respond to the BWXT address. Long provided this information to Weaver and N. Johnson.

On September 15, 2005, Weaver, Long and N. Johnson met with Escher. Escher said that he understood BWXT's policies but that he had permission from McKeethan to be copied on e-mails and that he would auto forward e-mails to his home. Escher also told them that he now had a better computer at home and had told people to send Navy e-mails to his home e-mail address. In his deposition, Escher did not agree with all of the notes of

---

[3] In response to the USERRA complaint Escher made to the Department of Labor after he was terminated, Long performed a more detailed analysis of Escher's e-mails and discovered five folders with an additional 2,000 Navy-related e-mails. While Escher's use of BWXT's telephone for Navy Reserve business was not a basis for his termination, later investigation and admissions by Escher indicate that he made 574 long distance calls and 110 local calls that were related to Navy Reserve business. The calls were made during the workday on BWXT's phone system. BWXT's policy regarding phone use is, "The Company telephones are for official business use and personal calls must be kept to minimum. Under no circumstances are the cost of long-distance calls for other than company business to be charged to BWXT." Escher testified that he always had permission from McKeethan for the few Navy-related calls that he made.

13

the conversation taken by Weaver when he was asked about the e-mails and documents. He did maintain that McKeethan knew when he was doing Naval Reserve work that Jerry Harris knew about such work as well.

N. Johnson testified that Weaver's notes accurately summarized the meeting and that for her the important points were that Escher told them he had permission from McKeethan to perform the Navy work; that there was an ongoing dialogue about the work; that Escher had shared with McKeethan some information from Navy-related e-mails within the last two weeks; that McKeethan knew Escher made up the time he spent on the Navy work either before or at the end of the day; that Jerry Harris could corroborate that McKeethan had given approval and that he had ongoing knowledge of the Navy work and also that Escher made up the time he spent doing the Navy work.

Right after the interview with Escher, N. Johnson, Long, and Weaver telephoned McKeethan who was vacationing in New Mexico. McKeethan testified in his deposition that he was told that a "massive" amount of Navy-related e-mails and documents were found on the Y-12 computer that Escher had stored. Long relayed to McKeethan what Escher had said about his knowing about the Naval Reserve work and Escher always having permission from McKeethan to do it. McKeethan stated that he could only specifically recall talking to Escher about Navy work after 911 when Escher asked to make some phone calls and send e-mails and forward e-mails to his home. McKeethan gave him permission but told him to keep it to a minimum. McKeethan said this also happened a time or two at the start

14

of the Iraq war. However, he said that he did not give Escher blanket permission to do Naval Reserve business while at work.

N. Johnson asked McKeethan if he knew whether Escher stayed late to make up the time he spent doing Navy work, and he responded that he did not recall that. McKeethan said Escher would work late occasionally during audits or for other work-related deadlines to make up time spent with his daughter but not specifically to make up for Navy work. McKeethan told them about Prichard's complaint and Escher's denial of the allegations, stating that Escher said he was only forwarding e-mails to his home address.

N. Johnson reviewed many of the e-mails herself at the Employee Relations office. Based on what she observed, she concluded that Escher was not auto-forwarding e-mails to his home but was sending, responding, and interacting with thousands of messages. She also found that Escher was not doing this at lunch or outside of business hours but during the workday. N. Johnson saw that Escher had his BWXT e-mail address, telephone number and fax number at the bottom of his e-mails which invited recipients to respond to him at work. N. Johnson testified that she made a rough estimate of the time Escher had put into the e-mails, the file creation etc., and concluded that the use was not incidental and that Escher was doing Naval Reserve work at the expense of BWXT.

N. Johnson contacted Weaver about reviewing discipline in other cases involving such conduct. Weaver informed her that a number of employees had been fired for violation of the computer use policies, primarily for internet abuse. Specifically, he told

15

her about an African-American woman who had been using the company's e-mail to operate a hat-selling business. This woman had sent and received approximately 200 e-mails and was terminated for her conduct.

N. Johnson, Weaver, and Long, met on September 16, 2005, to brief Brown on the recommendation from Employee Relations regarding Escher, which was that his violations of the company's policies were a basis for termination. N. Johnson has testified that she remained unconvinced. She, having a military background herself as a former Army officer, had been reluctant to terminate Escher for Naval Reserve work.

On September 20, 2005, Long interviewed Harris who said he had not overheard any conversations between Escher and McKeethan about making up time after business hours for Naval Reserve work done during the work day. Harris told Long that he observed Escher staying late on occasion.

On or about September 20, 2005, N. Johnson met with Dennis Ruddy ("Ruddy"), BWXT's President and General Manager. N. Johnson explained to Ruddy the conflict she was faced with: One side was that Escher was doing Naval Reserve work for the same government that wanted him to perform well as a BWXT employee and the other side was that other employees had been terminated for using the company's computers less than Escher had. The situation regarding the African-American woman was discussed. N. Johnson has testified that Ruddy asked one question: between Escher and the hat seller, who had derived more personal gain from misuse of the computer? N. Johnson testified that she

16

concluded it was Escher who derived the greater benefit because of his reserve pay and opportunities for promotion that would come from his being available to do Navy work during the workday. At that point, N. Johnson decided that Escher would be terminated.

N. Johnson testified that the decision to terminated Escher was hers alone to make. On September 21, 2005, she met with Weaver and Long and informed them of her decision regarding Escher. N. Johnson, Weaver, and Long also conferred with Jim Barnes ("Barnes"), the acting Human Resources Manager, about the decision. He mentioned the African-American woman who had been terminated for using the e-mail system for her hat-selling business, and he agreed that termination of Escher was appropriate. On September 22, 2005, N. Johnson, Weaver, and Long met with Escher and informed him that he was terminated.

N. Johnson, Weaver, and Long all affirmatively testified that they had no knowledge about Escher's complaint concerning how his military leave was being charged in the payroll system. They have also testified that they had no knowledge that he was alleging a USERRA violation and that these issues were never discussed during their investigation of Escher's e-mail use.

Escher made a USERRA complaint to the United States Department of Labor, Veteran's Employment and Training Services ("DOL") on September 29, 2005, alleging that he had been wrongfully terminated "in retaliation for involving ESGR in a USERRA issue regarding unpaid military absences." The DOL issued an agency finding on November 22,

2005, that Escher's claim was without merit as he had not established a link between his military obligation and his termination. Escher has taken exception to how the investigation was performed and the information relied on by George Pearson, the DOL Assistant Director who issued the agency decision.

## II.

*Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party may discharge its burden by demonstrating that the non-moving party has failed to establish an essential element of that party's case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party need not support its motion with affidavits or other materials negating the opponent's claim. *Id.* at 323. Although the moving party has the initial burden, that burden may be discharged by a "showing" to the district court that there is an absence of evidence in support of the non-moving party's case. *Id.* at 325 (emphasis in original).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to

18

present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

## III.

### *Analysis*

### A. Escher's USERRA Claim

One of the goals of USERRA is "to prohibit discrimination against persons because of their service in the uniformed services." *Curby v. Archon*, 216 F.3d 549, 556 (6th Cir. 2000). Section 4311(b)[4] of USERRA provides that "[a]n employer may not discriminate

---

[4] Section 4311 is a congressional response to the Supreme Court's decision in *Monroe v. Standard Oil Co.*, 452 U.S. 549 (1981). In *Monroe*, the Supreme Court held that USERRA's antecedent, the Vietnam Era Veterans' Readjustment Assistance Act of 1974,

(continued...)

in employment against or take any adverse employment action against any person because such person . . . has exercised a right provided for in this chapter." 38 U.S.C. § 4311(b). Section 4311(a) states: "A person who is a member of . . . a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation." 38 U.S.C. § 4311(a). USERRA prohibits adverse employment actions "if the person's membership . . . or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership . . . or obligation for service." 38 U.S.C. § 4311(c)(1). However, "USERRA does not provide for paid military leave." *Boelter v. City of Coon Rapids*, 67 F. Supp. 2d 1040, 1047 (D. Minn. 1999) (citing 38 U.S.C. § 4303(2) (the term "benefit" does

---

[4](...continued)

> "was enacted for the significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated *solely by* reserve status." *Id.* at 559, 101 S. Ct. 2510 (emphasis added). Congress amended the statute in 1994 to provide that a violation occurs when a person's membership in the uniformed services is a *motivating factor*, even if not the sole factor. Stated otherwise, Congress intended to lessen, but not eliminate, a [plaintiff's] obligation to show that the employer's adverse decision was related to his or her service in the armed forces.

*Hance v. Norfolk S. Ry. Co.*, --- F.3d ----, No. 07-5475, 2009 WL 1872246, at *3 (6th Cir. July 1, 2009) (quoting *Curby v. Archon*, 216 F.3d 549, 556-57 (6th Cir. 2000) (internal citations omitted)).

20

not include wages)); *see also Gordon v. Wawa, Inc*., 388 F.3d 78, 82 (3rd Cir. 2004) (paid

military leave not a benefit guaranteed by USERRA).

A USERRA plaintiff must demonstrate that his or her service in the military

was a motivating factor in the adverse employment action. *Hance*, 2009 WL 1872246, at *4

(citing 38 U.S.C. § 4311(c)(1)) ("*Hance II*"). "A motivating factor is one that 'a truthful

employer would list if asked for the reasons for its decision.'" *Grosjean v. FirstEnergy*, 481

F. Supp. 2d 878, 883 (N.D. Ohio 2007) (quoting *Brandsasse v. City of Suffolk*, 72 F. Supp.

2d 608, 617 (E.D. Va. 1999)); *see also Hance v. Norfolk S. Ry. Co.*, No. 3:04-CV-160, 2006

WL 1367372, at *3 (E.D. Tenn. May 17, 2006) ("*Hance I*"). Military position is a

motivating factor if the defendant "relied upon, took into account, considered, or conditioned

its decision on" such position and obligations. *Robinson v. Morris Moore Chevrolet-Buick*,

974 F. Supp. 571, 576 (E.D. Tex. 1997) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228,

250 (1989) (writing in the context of Title VII gender discrimination)).

Discriminatory intent under USERRA may be shown by direct or

circumstantial evidence. *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001).

> Discriminatory motivation under the USERRA may be
> reasonably inferred from a variety of factors, including
> proximity in time between the employee's military activity and
> the adverse employment action, inconsistencies between the
> proffered reason and other actions of the employer, an
> employer's expressed hostility towards members protected by
> the statute together with knowledge of the employee's military
> activity, and disparate treatment of certain employees compared
> to other employees with similar work records or offenses.

21

*Id.*

"Once the plaintiff has discharged this initial burden of establishing a prima facie case of discrimination, 'the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason.'" *Hance II*, 2009 WL 1872246, at *4 (quoting *Sheehan*, 240 F.3d at 1013 (internal citations omitted)). The burden "'shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action.'" *Hance II*, 2009 WL 1872246, at *4 (quoting *Sheehan*, 240 F.3d at 1014). In USERRA cases, both the burden of production and burden of persuasion shift to the employer. This procedure differs from analysis in cases arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), in which only the burden of production shifts to the employer once the plaintiff has demonstrated a prima facie case. *Sheehan*, 240 F.3d at 1014.

> Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the [employer's] action, upon which the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status.

*Id.*

Escher says he brought this lawsuit because he was terminated for complaining about how his military leave was accounted for in the company's payroll system. Escher contends that even if BWXT's policy requiring him to take vacation or unpaid personal leave

22

for partial week absences for his military leave does not violate USERRA, he argues that he perceived it as illegal under the act. For the purposes of summary judgment, BWXT is willing to assume *arguendo* that Escher engaged in conduct protected by USERRA when he made his complaints. Under USERRA, then, Escher has to make an initial showing that his complaints about his military leave were at least a motivating factor in BWXT's action to terminate his employment.

The first *Sheehan* discriminatory factor that Escher argues is the temporal proximity of the investigation and termination and his USERRA complaints. He contends that the investigation into his e-mail use that was started August 17, 2005, was begun less than 30 days from the time he made his complaints to C. Johnson and Smith-Bledsoe. He points out that he sent USERRA material to C. Johnson on July 29, 2005, 19 days before the investigation started. He also argues that N. Johnson met with Brown on September 16, 2005, one week after Gerard had mailed Brown the letter inquiring about USERRA compliance. Escher also tries to impute knowledge of his complaints to N. Johnson, Weaver, and Long who have affirmatively testified that they had no knowledge of his time reporting issues.

Initially, the court notes that the record shows that the investigation into Escher's e-mail use was started by the anonymous NMS complaint. Nothing in the record nor anything argued or submitted by Escher calls into question the validity and anonymity of this complaint, and nothing shows that it was inappropriately or incorrectly pursued by the

23

ethics officer. Escher has not linked this complaint in any way with the timing of his complaints about his military time.

Escher also has not presented sufficient proof to counter the affirmative testimony by N. Johnson, Weaver, and Long that they had no knowledge about and did not discuss in their deliberations Escher's dispute about his military leave. Escher only offers conclusory and speculative statements that attempt to impute knowledge to these people. For example, Escher mistakenly argues that C. Johnson and Smith-Bledsoe work in the same department as Long, Weaver, and Cottrell.[5] However, even if there were some interdepartmental connection between some of these people, that fact alone is not sufficient to challenge the affirmative testimony by N. Johnson, Weaver, and Long. Weaver states in his second declaration that the subject of Escher's military leave complaints did not come up in the meeting with Brown prior to Escher's termination. Escher tries to cast doubt by saying N. Johnson had not made up her mind to fire Escher by September 16, 2005, when they met and Brown knew about the complaints. It is speculation to impute to N. Johnson and the others in that meeting Brown's knowledge about Escher's complaints. Additionally, Escher has not shown that the decision maker, N. Johnson, a former military person herself, had any hostility toward Reservists. She in fact was hesitant in acting because of Escher's Naval Reserve work. Further, when N. Johnson met with Brown on September 16, 2005, she was well aware of the extent to which Escher had been using the BWXT e-mail system. Escher

---

[5] Weaver sets out the correct department assignments for each of these employees in his second declaration [doc. 51].

also has not presented any evidence that BWXT held any hostility toward Reserve employees, no doubt because that would be futile in light of the evidence presented in the record showing BWXT's support of National Guard and Reservist employees. Plus, Escher has always had his military leave requests granted and had twice nominated McKeethan for a "Certificate of Appreciation" from ESGR for "outstanding service to the national defense through continuing support for the National Guard and Reserve."

There is no corroboration for the bare assertions that are attempts to impute knowledge to various BWXT employees, and they fall short of raising a genuine issue of material fact. *See* 10A Charles Allan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2727 (3d ed. 1998) ( "[E]vidence in opposition to the motion that clearly is without any force is insufficient to raise a genuine issue. Thus, neither frivolous assertions nor mere suspicions will suffice to justify a denial of summary judgment. . . . The evidence offered must have the force needed to allow a jury to rely on it . . . ."). No reasonable jury could find that the timing of the anonymous complaint was linked to Escher's complaints about his military time. Thus, the court concludes that temporal proximity does not show any discriminatory intent.

Escher next argues that there are inconsistencies in the proffered reason for the investigation, termination, and other BWXT actions. Escher argues that the complaint that was investigated in early 2005 is "[i]n essence, . . . the same complaint made on August 17 which was cited as the sole basis for the investigation and eventual termination." Escher

25

contends that the first complaint was investigated and closed and that his computer use for Naval Reserve use only became an issue after he complained in July about his military leave.

This, however, distorts the record. The documented proof shows that when the first complaint was investigated, Escher's e-mail was not examined as part of the investigation. Weaver thought McKeethan was referring to Escher's internet use and asked Cyber Security to check for internet misuse. There was no problem with Escher's use of the internet, and that was reported to Weaver. Thus, there is no proof that the extent of Escher's use of the BWXT e-mail system was discovered by anyone in February 2005 when the first complaint was investigated.

The August 2005 complaint arose from the anonymous NMS complaint, and there is no probative evidence showing otherwise. As described above by the sequence of events, Escher's e-mail was reviewed this time, and the extent of his use led to his termination. The record does not support Escher's contention that these two complaints were handled inconsistently.

Escher also argues that there are inconsistencies in the interpretations of the policies relied on to terminate him. Escher contends that his Naval Reserve work constituted "official U.S. Government business" as identified in Policy No. Y15-404. In support of this contention, Escher has presented the testimony of Harris. Escher contends that there is a question of fact because N. Johnson, Long, Weaver, and McKeethan all described "Official U.S. Government business" differently in their testimony.

This contention by Escher requires little discussion. The court has reviewed all of the testimony concerning "official U.S. Government business" and finds it unnecessary to cite or discuss all of it here. In the court's opinion, "official U.S. Government business" as that term is used by BWXT means the business engaged in by BWXT Y-12, that business which is authorized by official approval process and supported by work authorization. It is the work at BWXT that Escher was being paid to perform; it is not the thousands of e-mails that Escher has admittedly identified as being related to his Naval Reserve work. The fact that Escher's co-worker Harris holds the opinion that what Escher did falls within "official government business" is irrelevant. He was not Escher's supervisor and was not a decision maker in the termination. BWXT characterized Escher's argument that he could engage in this conduct and refer to it as "official U.S. Government business" as disingenuous. The court agrees.

Escher also argues that various BWXT witnesses testified differently regarding what constitutes "incidental use" of the e-mail system. That argument warrants little discussion as well. Escher's use of the BWXT e-mail system was not "incidental" by any definition of BWXT's policies; by any dictionary definition; or by any common sense understanding of the term. The fact that several witnesses may have interpreted the term in BWXT's policies or procedures somewhat differently is not material. Common sense dictates and the record supports the conclusion that Escher's use of the e-mail system for which he was terminated was not "incidental" by any interpretation of the term "incidental

27

use" as set out by BWXT.

Escher additionally argues that there is a dispute concerning whether he had management approval to use the e-mail system for his Naval Reserve work. However, the proof does not show that BWXT's management knew the extent of Escher's e-mail use and condoned that use. McKeethan has testified that he did not give Escher *carte blanche* permission to perform his Naval Reserve business using the Y-12 computer and phone systems. When McKeethan confronted Escher in February 2005 about Prichard's complaint, Escher denied the allegations and said he was only auto forwarding e-mails to his home address. McKeethan knew Escher received e-mails regarding his Navy orders and occasional "soldier on ground" e-mails that Escher shared with him. When McKeethan spoke with Taylor during the investigation in August 2005, he told her that he had not given Escher permission to do Naval Reserve work during business hours. During the interview with N. Johnson, Weaver, and Long, McKeethan said he recalled discussing Escher's performing Navy work at Y-12 just after the September 11, 2001 attacks. McKeethan gave Escher permission to make calls and send e-mails but told him to keep it to a minimum. A similar discussion occurred at the outbreak of the Iraq war. McKeethan told N. Johnson, Weaver, and Long that he had not given Escher permission to perform Navy business at work and should have known better.

Escher contends and cites to examples in the record to support his contention that McKeethan knew about his Naval Reserve work and that McKeethan and others knew

he received occasional Navy-related e-mails and telephone calls. McKeethan admittedly knew about Escher's Naval Reserve service and his periodic need to send e-mails or use the phone in connection with that service. However, it is apparent from the record that McKeethan did not know the extent to which Escher was using the BWXT e-mail system for Navy Reserve related business. As of February 2005, McKeethan was told by Escher that he was just auto forwarding e-mails to his home address. This is different from what was found as a result of the August 2005 investigation when thousands of e-mails were found in organized files with some documents being stored outside the e-mail system. The record does not support Escher's contention that he had permission from management to perform Naval Reserve work at Y-12 during work hours.

After considering Escher's arguments regarding inconsistencies between the proffered reason for his termination and other actions by BWXT, the court concludes that they do not indicate discriminatory motive on the part of BWXT.

Escher does not even address the factor of whether BWXT expressed hostility toward military reservists. Therefore, the court will address the last *Sheehan* factor Escher argues, the disparate treatment of certain employees compared to Escher for similar offenses. BWXT submitted evidence concerning employees who were disciplined for computer abuse from the time BWXT took over management responsibilities of Y-12 and Escher's termination. For the period between November 2000 and Escher's termination in September 2005, BWXT's records indicate that ten employees were terminated for computer abuse.

29

Before Escher was terminated, the only employee fired for using the e-mail system for non-work related business was the black female who was operating a hat-selling business.

Escher contends that three employees reprimanded after his termination for abuse of the e-mail were not terminated. Initially, the court observes that what occurred after his termination is not relevant. In any event, Escher does not compare himself "to other employees with similar work records or offenses." *Sheehan*, 246 F.3d at 1014. He argues these individuals were disciplined short of termination, but he admits he has no information on their employment performance. Further, the number of e-mails that each of these individuals had on the Y-12 computer system stand in stark contrast to Escher's thousands. One individual had 26, one had 54, and one had 68. This fact alone sets these individuals apart from Escher.

In addition, Escher argues that he is different from the black female who was terminated because N. Johnson testified that "the Naval Reserve was not a personal enterprise or a profit-making venture." However, this does not reflect N. Johnson's entire testimony on the subject. She went on to state that "both of these [policies] make a lot of association with personal business and personal gain. And ultimately I came to reflect on, while the Naval Reserve business was not a personal enterprise that Rudy had developed and was a profiteer from, he had significant potential to benefit from conducting Naval Reserve business at work at Y-12." She explained that a military officer benefits from "how selfless, immediate, responsive, squared away you appear to your organization and particularly to your superiors

30

that then provide for your career to be advanced, promotion opportunities, additional expanse of assignment opportunities." N. Johnson was certainly speaking with authority since she is a former Army officer. Therefore, she concluded that Escher received personal gain from doing Naval Reserve work during business hours.

Escher has not presented convincing evidence that he was treated differently than other similarly situated employees. This factor therefore does not show any discriminatory motive on the part of BWXT.

After considering Escher's arguments and proof, the court concludes that he has not made a prima facie showing that his complaints about how his military leave was charged were a motivating or substantial factor in his termination. Escher's proof and contentions do not show or raise a question of fact as to whether BWXT "relied on, took into account, considered, or conditioned its decision" to terminate him on the basis of the complaints he made concerning how his military leave was charged. Escher has just not connected his complaints with the August 2005 investigation or with the decision to terminate him based on the results of that investigation. He has offered nothing other than speculation and uncorroborated assertions in an attempt to link those performing the investigation with his military leave complaints. These are not sufficient to overcome the affirmative evidence from the defendant's witnesses concerning the origin of the August 2005 investigation and lack of knowledge by N. Johnson, Weaver and Long about his complaints concerning his military leave. To survive summary judgment, a plaintiff must present more than conclusions

and speculation. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993) (factual dispute which "is merely colorable or is not significantly probative" will not defeat summary judgment). The Sixth "[C]ircuit has long held that '[m]ere conclusory and unsupported allegations, rooted in speculation, do not meet [the] burden'" of demonstrating that there is a genuine issue for trial. *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) (quoting *Bryant v. Ky.*, 490 F.2d 1273, 1274 (6th Cir. 1974)).

Nevertheless, even if it is assumed for the purposes of argument that Escher has made a prima facie showing under USERRA, BWXT has the opportunity to avoid liability by presenting by a preponderance of the evidence that it would have taken the same adverse action for a valid reason. *Sheehan*, 240 F.3d at 1014. Escher's argument regarding this defense is based on his contention that the only difference between the February 2005 investigation and the investigation initiated in August 2005 is that the identity of the complainant in the February matter was known. He contends that no action was taken on the first complaint, but action was taken on the second complaint because it occurred after he had complained about his military leave.

The record does not support Escher's contention. As has been discussed above in connection with the February 2005 investigation, Weaver mistakenly thought McKeethan wanted Escher's internet usage looked into, and therefore Weaver did not look at Escher's e-mail at that time. Also at that time, Escher told McKeethan that all he was doing was auto forwarding e-mails to his home address. Escher's arguments do not counter the reasons and

supporting documentation that N. Johnson has given for Escher's termination. BWXT has met its preponderance of the evidence burden to demonstrate that it had a valid reason to terminate Escher.

In a related argument made elsewhere in his brief, Escher contends that there is a material issue of fact concerning whether N. Johnson was the sole decision maker and that her decision to terminate Escher was lacking a reasonable basis. There is no material issue regarding whether N. Johnson was the sole decision maker because Escher has presented no evidence that places that fact at issue.

With regard to N. Johnson's decision to terminate Escher, he claims that she never personally spoke with Harris and she spoke with Escher only once before his termination. Escher claims N. Johnson did not have details about how much time he spent on the e-mails at work, how many e-mails he just forwarded, or how many he did not respond to at all. Escher points out that the number of e-mails were accumulated from 1999 to 2005 and that Long said it was impossible to determine how much time was spent on the emails. He argues that Harris was interviewed once by Long, and while he could not recall any conversations about making up time after hours, he specifically told Long that he knew Escher performed Navy work while at BWXT.

The steps that N. Johnson, Weaver, and Long went through in investigating Escher e-mail use and the process N. Johnson followed in making her final decision to terminate Escher are set out above. They indicate that after Escher was given an opportunity

33

to explain the Navy-related e-mails on the Y-12 computer, his explanation was checked out. When Escher's story was not corroborated, N. Johnson studied the e-mails as well as consulted with Human Resources, Legal, the EEO officer, and the President of BWXT before making her final decision.

Escher's argument regarding the alleged deficiency in N. Johnson's decision falls more appropriately under this section because Escher is basically saying that BWXT's reasons for firing him were a pretext for discriminating against him based upon his leave complaints. Once the burden of production and persuasion has shifted to the employer under USERRA, the employer "must prove the nonpretextual, permissible reason for termination notwithstanding uniformed service as an affirmative defense." *Hance I*, 2006 WL 1367372, at *4. "In determining pretext, the question is whether the employer defendant honestly believed its reason for the adverse employment action." *Id.* (citing *Clune v. Desmond's Formal Wear, Inc.*, No. 2:01-CV-606, 2003 WL 21796388, at *8 (N.D. Ind. Feb. 4, 2003)). The Sixth Circuit has adopted for use in discrimination cases a "modified honest belief" rule which states that "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made."*Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)). "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith*, 155

34

F.3d at 807. The investigation process does not need to be perfect, but the decision has to be "reasonably informed and considered." *Graham v. Best Buy Stores*, 298 F. App'x 487, 494 (6th Cir. 2008) (quoting *Wright*, 455 F.3d at 708). The employer needs to show that it "made its decision to terminate [the employee] based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation." *Graham*, 298 F. App'x at 494 (quoting *Wright*, 455 F.3d at 709).

BWXT has presented detailed evidence describing the investigation it undertook in response to the NMS anonymous complaint. The evidence from BWXT and N. Johnson indicate that she honestly believed what she heard from McKeethan in the interview that was held immediately following the interview with Escher. The evidence of Escher's e-mail use for Naval Reserve work is well documented in the record, and N. Johnson reviewed much of that material herself before making her decision. She also dealt with the issue of the black female employee who had been terminated for 200 e-mails used for her hat-selling business. Escher's complaints about the investigation do not show that the investigation was not adequate or that the decision was not reasonably informed or considered. The record reflects that N. Johnson had sufficient information from various sources in front of her before she made her decision. Escher has failed to demonstrate that N. Johnson did not have an honest belief in the reasons for terminating Escher.

35

## B. Escher's TPPA Claim

Escher alleges in the complaint as the basis for his TPPA claim that he was terminated "because of his refusal to remain silent concerning violations of civil codes of this State and the United States." Under the TPPA, "the plaintiff must demonstrate an *exclusive causal relationship* between his whistleblowing activity and his subsequent discharge. That is, the plaintiff must show that he was terminated solely because of his whistleblowing activity." *Sacks v. Jones Printing Co., Inc*., No. 1:05-CV-131, 2006 WL 686874, at *3 (E.D. Tenn. Mar. 16, 2006) (citing *Darnall v. A+ Home Care, Inc*., No. 01-A-01-9807-CV-0034, 1999 WL 346225, at *5 (Tenn. Ct. App. June 2, 1999)) (emphasis in original).

In order to establish a prima facie case under the TPPA, a plaintiff must demonstrate four elements:

> (1) The plaintiff's status as an employee of the defendant;
> (2) The plaintiff's refusal to participate in, or to remain silent about, illegal activities;
> (3) The employer's discharge of the employee; and
> (4) An exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.

*Sacks*, 2006 WL 686874, at *4 (citing *Hill v. Perrigo of Tenn*., No. M2000-02452-COA-R3-CV, 2001 WL 694479, at *3 (Tenn. Ct. App. June 21, 2001)). "Once a plaintiff has made out a prima facie case, the burden shifts to the employer to advance a non-discriminatory reason for the termination. The burden then shifts back to the plaintiff to show that his termination

36

was solely for the reasons which he initially alleged." *Sacks*, 2006 WL 686874, at \*4 (internal quotation marks and citations omitted). "Courts have recognized 'that the plaintiff has indeed a formidable burden in establishing elements number two and four of the cause of action.'" *Hill*, 2001 WL 694479, at \*5 (and cases cited therein).

There is no issue concerning the first and third elements as Escher was clearly BWXT's employee and he was terminated by BWXT. With regard to the second element of the prima facie case, Escher does not fit the class of employees the statute was designed to protect. Nothing in the record demonstrates that Escher was faced with the moral dilemma of being forced to choose between keeping his job or reporting alleged code violations. *Moore v. Averitt Express, Inc*., No. M2001-02502-COA-R3-CV, 2002 WL 31302947, at \*4 (Tenn. Ct. App. Oct. 11, 2002) ("Inherent in the underlying philosophy of the retaliatory discharge cause of action is that at-will employees should not be placed in the moral, ethical and legal dilemma of being forced to choose between reporting illegal activities and keeping their jobs."). Additionally, "the threat of dismissal must be contemporaneous with the decision to report the illegal activities." *Id*. (citations omitted).

> In order to maintain an action for retaliatory discharge, the plaintiff must be in the class of people the common law tort and the statute were designed to protect. He must have been an at-will employee faced with the choice of reporting an illegality, thereby running the risk of being discharged as retaliatory result, or remaining silent, thereby keeping his job at the expense of the public interest.

*Id.* This was certainly not the circumstance in this case. Escher was not faced with contemporaneous discharge when he complained about how his military reserve service time was being charged to his personnel record. There is simply no proof in the record that Escher was in the dilemma of fearing for his job if he challenged how his military time was charged. He complained loudly and often to his employer and the ESGR; he did not keep silent for fear of losing his job.

In addition, "it is essential that the employee's attempt to expose illegal or unsafe practices do more than merely advance the employee's private interest." *Bright v. MMS Knoxville, Inc*., No. M2005-02668-COA-R3-CV, 2007 WL 2262018, at *4 (Tenn. Ct. App. Aug. 7, 2007) (citing *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 538 n.4 (Tenn. 2002)). Escher's conduct involved a private and self-serving interest. His alleged reporting efforts had nothing to do with seeking to protect the public good. Escher's obvious concern was that he did not want to take unpaid personal leave because that would reflect poorly on his personnel record. His efforts were not concerned with protecting the public good.

Escher also cannot meet the fourth element of the prima facie case, the exclusive causal relationship between his termination and his refusal to participate in or remain silent about alleged civil code violations. *See Hill,* 2001 WL 694479, at *3; *Sacks*, 2006 WL 686874, at *4. There is clear and direct proof demonstrating that Escher was terminated for abuse of BWXT's computer use policies, specifically the company's email system. Based on that documented evidence, Escher could not possibly demonstrate that he

38

was terminated *solely* because of his refusal to remain silent about alleged code violations.

This fact alone requires summary judgment on Escher's TPPA claim.

## C. Escher's Common Law Retaliation Claim

In order to establish a prima facie case of common law retaliatory discharge, a plaintiff must demonstrate:

> (1) that an employment-at-will relationship existed; (2) that he was discharged; (3) that the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge him was his exercise of protected rights or compliance with clear public policy.

*Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 528 (Tenn. Ct. App. 2006)(citing *Crews v. Buckman Labs. Int'l, Inc*., 78 S.W.3d 852, 862 (Tenn. 2002)); *see also McLeay v. Huddleston*, No. M2005-02118-COA-R3-CV, 2006 WL 2855164, at *6 (Tenn. Ct. App. Oct. 6, 2006). The essential difference between the statutory cause of action for retaliatory discharge and the common law cause of action is that with the common law cause of action a plaintiff need only show that his activity was a substantial factor in effectuating his discharge rather than showing it was the sole reason for his discharge. *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. 2002).

If the plaintiff makes the necessary prima facie showing, the burden shifts to the employer to articulate a legitimate, non-pretextual reason for the discharge. *Yates v. Hertz Corp.*, 285 F. Supp. 2d 1104, 1117 (M.D. Tenn. 2003) (citations omitted). If the employer offers a legitimate reason for terminating the plaintiff, the burden then shifts back to the plaintiff to show that the reason given is pretextual or not worthy of belief. *Id.* at 1118 (citations omitted). "Essentially, causation does not exist if the employer's stated basis for the discharge is valid and non-pretextual." *Id.* (citations omitted). In order to establish pretext, a plaintiff must demonstrate that (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate plaintiff's termination; or (3) the proffered reason was insufficient to motivate plaintiff's discharge. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

Escher certainly can establish elements one and two of a prima facie case. However, he cannot establish elements three and four. Escher has not presented proof that even raises an issue of fact as to whether his termination was the result of his attempt to exercise a statutory right or that his discharge violated a regulatory or statutory provision. The decision maker, Nancy Johnson, and those who investigated Escher's computer use have affirmatively testified that they did not know about Escher's complaint regarding how his military service time was being charged in July 2005. Escher has not presented any evidence that is sufficient to raise an issue of fact as to that evidence or that links his termination to his military leave complaints. The same is true for the fourth element of the prima facie case.

Escher has not presented evidence that would demonstrate that a substantial factor in BWXT's decision to discharge him was his complaint about his military time. Again, as discussed above, Escher has not presented sufficient proof linking his termination and the decision maker for that termination N. Johnson with his military leave complaints.

However, even if it is assumed for the purposes of argument that Escher can establish a prima facie case of common law retaliatory discharge, BWXT has articulated a legitimate, non-pretextual reason for his discharge. The record is well documented by BWXT concerning its reason for finding that Escher abused the company's email system and violated company policy in doing so. The burden then shifts to Escher to show that the stated reason is pretextual. Escher does not even attempt to do so. In any event, there is ample evidence in the record that BWXT's reason was based in fact, that it did in fact motivate Escher's termination, and that the proffered reason was sufficient to terminate Escher's employment. Accordingly, summary judgment as to Escher's common law retaliatory discharge claim is appropriate.

IV.

*Conclusion*

For the reasons set forth herein, BWXT's motion for summary judgment is well taken and will be granted. Accordingly, this civil action will be dismissed. An order consistent with this opinion will be entered.

41

ENTER:


_____ s/ Leon Jordan _____
United States District Judge